UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
FRANKFORT DIVISION

| | | |
|---|---|---|
| HEATHER GALASSO, individually and on behalf of all others similarly situated, | ) ) ) | Civil Action No.: 3:11cv_____ |
| Plaintiffs | ) ) | |
| v. | ) ) ) | CLASS ACTION COMPLAINT |
| BANK OF AMERICA, N.A. and BAC HOME LOANS SERVICING, LP, | ) ) ) | <u>JURY TRIAL DEMANDED</u> |
| Defendants | ) ) | |

## INTRODUCTION

Plaintiff, individually and on behalf of all other persons similarly situated, hereby alleges the following upon personal knowledge as to herself and upon information and belief as to all other matters based upon the investigation of her attorneys. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    In October 2008, Bank of America accepted $15 Billion in funds from the United States Government as part of the Troubled Asset Relief Program ("TARP"), 12 U.S.C. § 5211. In January 2009, in connection with its acquisition of Merrill Lynch, Bank of America accepted another $ 10 billion in TARP funds along

1

with a partial guarantee against losses on $118 billion in mortgage-related assets. By accepting these payments, Bank of America agreed that it would participate in one or more programs that TARP authorized the Secretary of the Treasury to establish, and which the Secretary deemed necessary to minimize foreclosures.

2.      Consistent with the TARP mandate, the Treasury Department implemented the Home Affordable Modification Program ("HAMP") – a detailed program designed to stem the foreclosure crisis by providing affordable mortgage loan modifications and other alternatives to foreclosure, to eligible borrowers. Companies that accepted money under the TARP are subject to mandatory inclusion in HAMP as are certain classes of loans, namely those held by Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage Corporation ("Freddie Mac").

3.      Bank of America signed a contract with the U.S. Treasury on April 17, 2009 agreeing to comply with the HAMP requirements and to perform loan modification and other foreclosure prevention services described in the program guidelines. The guidelines issued by the Treasury Department set forth a detailed process whereby a participating servicer such as Bank of America, acting through its subsidiary BAC Home Loans Servicing, must:

- Identify loans that are subject to modification under the HAMP program, both through its own review and in response to requests for modification from individual homeowners;

2

- Collect financial and other personal information from the homeowners to evaluate whether the homeowner is eligible for a loan modification under HAMP;

- Institute a modified loan with a reduced payment amount as per a mandated formula, that is effective for a three-month trial period for borrowers that are eligible for a modification; and

- Provide a permanently modified loan to those homeowners who comply with the requirements during the trial period.

- Whether the homeowner qualifies for a modification or not, participating servicers are also required to provide written notices to every mortgage borrower that has been evaluated for a loan modification, advising whether or not the borrower has been found eligible.

4. HAMP and its associated directives also set prohibitions against certain conduct including, but not limited to: demanding upfront payments in order to be evaluated for a loan modification; instituting or continuing foreclosures while a borrower is being evaluated for a loan modification; and restrictions on the way a servicer may report the borrower to credit reporting agencies.

5. Though Bank of America accepted $25 billion in TARP funds and entered into a contract obligating itself to comply with the HAMP directives and to extend loan modifications for the benefit of distressed homeowners, Bank of America has systematically failed to comply with the terms of the HAMP directives and has regularly and repeatedly violated several of its prohibitions.

3

6.     Under HAMP, the federal government incentivized participating servicers to make adjustments to existing mortgage obligations in order to make the monthly payments more affordable. Servicers receive $1,000.00 for each HAMP modification. However, this incentive is countered by a number of financial factors that make it more profitable for a mortgage servicer such as Bank of America to avoid modification and to continue to keep a mortgage in a state of default or distress and to push loans toward foreclosure. This is especially true in cases where the mortgage is owned by a third-party investor and is merely serviced by the servicer such as Bank of America. On information and belief, Bank of America services more loans than it owns.

7.     Economic factors that discourage Bank of America from meeting its contractual obligations under HAMP by facilitating loan modifications include the following:

- Bank of America is required to repurchase loans from the investor in order to permanently modify the loan. This presents a substantial cost and loss of revenue that can be avoided by keeping the loan in a state of temporary modification or lingering default.

- The monthly service fee that Bank of America, as the servicer collects as to each loan it services in a pool of loans, is calculated as a fixed percentage of the unpaid principal balance of the loans in the pool. Consequently, modifying a loan to reduce the principal balance results in a lower monthly fee to the servicer.

- Fees that Bank of America charges borrowers that are in default constitute a significant source of revenue to the servicer. Aside from the income Bank of America directly receives, late fees and "process management fees" are often added to the principal loan amount thereby increasing the unpaid balance in a pool of loans and increasing the amount of the servicer's monthly service fee.

- Entering into a permanent modification will often delay a servicer's ability to recover advances it is required to make to investors of the unpaid principal and interest payment of a non-performing loan. The servicer's right to recover expenses from an investor in a loan modification, rather than a foreclosure, in often less clear and less generous.

- Fixed overhead costs involved in successfully performing loan modifications involve up-front cost to the servicer for additional staffing, physical infrastructure, and expenses such as property valuation, credit reports, and financing costs.

8.     Rather than allocating adequate resources and working diligently to reduce the number of loans in danger of default by establishing permanent modifications, Bank of America has serially strung out, delayed, and otherwise hindered the modification processes that it contractually undertook to facilitate when it accepted billions of dollars from the United States. Bank of America's delay and obstruction tactics have taken various forms with the common result that homeowners, like Plaintiff, with loans serviced by Bank of America, who are

eligible for permanent loan modifications, and who have met the requirements for participation in the HAMP program, have not received permanent loan modifications to which they are entitled.

9.      In addition to its obligations based on its contract with the Treasury Department, bank of America has entered into written agreements with individual homeowners, including Plaintiff, for temporary loan modifications that must be converted to permanent loan modifications. Plaintiff and a similar class of borrowers have complied with the agreements by submitting the documentation asked of them and, when requested, by making payments. Despite Plaintiff's efforts, Defendant has ignored its contractual obligation to modify her loan permanently.

10.     Because Bank of America is not meeting its contractual obligations, at least hundreds if not thousands of Kentucky homeowners are wrongfully being deprived of an opportunity to cure their delinquencies, pay their mortgage loans and save their homes. By failing to live up to its obligations under the terms of the agreement it entered into with the Department of the Treasury, and the terms of the contracts its formed with individual homeowners, Bank of America has left thousands of borrowers in a state of chaos-often worse off than they were before they sought a modification from Bank of America. Defendants' actions violate contractual obligations, frustrate the purpose of HAMP, and are illegal under Kentucky law.

11.     Plaintiff Heather Galasso brings this suit on behalf of herself and a Class of similarly situated Kentucky residents to challenge the failure of Defendant Bank of America, N.A. and its subsidiary BAC Home Loans Servicing, LP (collectively referred to as "Defendants" or "Bank of America") to honor the terms of their agreement with the United States Treasury for the intended benefit of homeowners, their failure to honor agreements directly with individual homeowners to modify mortgages to a point that they are affordable and sustainable, and to recover costs and losses incurred as a result.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §1332(d)(2)  in that the matter is a class action wherein the amount in controversy exceeds the sum or value of $ 5,000,000, exclusive of interest and costs, and members of the Class are citizens of a State different from the Defendants.

13.     This Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 1367 in that Plaintiff and the members of the Class are intended third-party beneficiaries to a contact between Bank of America and the U.S. Treasury that was entered into pursuant to and under the direction of TARP. 12 U.S.C. § 5201 *et seq*.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) inasmuch as the unlawful practices are alleged to have been committed in this

District, Defendants regularly conduct business in this District, and the named
Plaintiff resides in this District.

## PARTIES

15.     Plaintiff Heather Galasso is an individual residing in Frankfort,
Kentucky.  Plaintiff, as detailed below, participated in a Temporary Payment Plant
and qualified for a permanent load modification but, due to Defendants
misconduct, has been denied a permanent loan modification, and has thus been
damaged as a result of this misconduct.

16.     Defendant Bank of American N.S. is a Delaware corporation with its
principle place of business in Charlotte, NC.

17.     Defendant BAC Home Loans Servicing, LP) ("BAC"), formerly doing
business as Countrywide Home Loans Servicing, LP ("Countrywide"), is a Texas
limited partnership with its principle place of business located in Calabasas, CA.
BAC is a subsidiary of Bank of America, N.A., and the two Defendants are
hereafter collectively referred to as "Bank of America."  Bank of Americas currently
does business and maintains branch offices throughout the State of Kentucky.

18.     This Court has personal jurisdiction over the parties in this action by
the fact that Defendants are corporations that are licensed to do business in the
Commonwealth of Kentucky or otherwise conduct business in the Commonwealth
of Kentucky.

## FACTS

### A. The Foreclosure Crisis

19.     Over the last three years, the United States has been in a foreclosure crisis.  A congressional oversight panel has recently noted that one in eight U.S. mortgages is currently in foreclosure or default.

20.     RealtyTrac, the leading online marketplace for foreclosure properties, released its Year-End 2010 U.S. Foreclosure Market Report, which showed a total of 3,825,637 foreclosure filings — default notices, scheduled auctions and bank repossessions — were reported on a record 2,871,891 U.S. properties in 2010, an increase of nearly 2 percent from 2009 and an increase of 23 percent from 2008. The report also shows that 2.23 percent of all U.S. housing units  (one in 45) received at least one foreclosure filing during the year, up from  2.21 percent in 2009, 1.84 percent in 2008, 1.03 percent in 2007 and 0.58  percent in 2006.

21.     Kentucky, like other states in the country, has been hard hit by the housing crisis.  The number of total Kentucky properties with foreclosure filings in 2010 was 12, 656. This number was up 31 percent from a year ago.

22.      According to RealtyTrac, 1 out of every 1,587 housing units in the Commonwealth of Kentucky received a foreclosure filing in January of 2010.

23.     Economists predict that interest rate resets on the riskiest of lending products will not reach their zenith until sometime in 2011.  *See* Eric Tymoigne, *Securitization, Deregulation, Economic Stability, and Financial Crisis,* Working Paper No. 563.2 at 9 Figure 30, available at http://papers.

Ssrn.com/so13/papers.cfm?abstract id=1458413 (citing a Credit Suisse study showing monthly mortgage rate resets).

**B. Creation of the Home Affordable Modification Program.**

24. Congress passed the Emergency Economic Stabilization Act of 2008 on October 3, 2008 and amended it with the American Recovery and Reinvestment Act of 2009 on February 17, 2009 (together the "Act"). 12 U.S.C.A. §201 *et seq.* (2009).

25. The purpose of the Act is to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership." *Id.*

26. The Act grants the Secretary of the Treasury the authority to establish the Troubled Asset Relief Program, or TARP. 12 U.S.C. § 5211. Under TARP the Secretary may purchase or make commitments to purchase troubled assets from financial institutions. *Id.*

27. Congress allocated up to $700 Billion to the United States Department of Treasury for TARP. 12 U.S.C. §5225.

28. In exercising its authority to administer TARP the Act mandates that the Secretary "shall" take into consideration the "need to help families keep their homes and to stabilize communities." 12 U.S.C. § 5213(3).

29. The Act further mandates, with regard to any assets acquired by the Secretary that are backed by residential real estate that the Secretary "shall

implement a plan that seeks to maximize assistance for homeowners" and use the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures."  12 U.S.C. § 5219.  The Act grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures." *Id.*

30.     The Act imposes parallel mandates to implement plans to maximize assistance to homeowners and to minimize foreclosures.  12 U.S.C. § 5220.

31.     On February 18, 2009 pursuant to their authority under the Act, the Treasury Secretary of the Director of the Federal Housing Finance Agency announced the Making Home Affordable program.

32.     The Making Home Affordable program consists of two subprograms. The first sub-program relates to the creation of refinancing products for individuals with minimal or negative equity in their home, and is now know as the Home Affordable Refinance Program or HARP.

33.     The second sub-program relates to the creation and implementation of a uniform loan modification protocol, and is now know as the Home Affordable Modification Program, or HAMP.

34.     HAMP is funded by the federal government, primarily with TARP funds.  The Treasury Department has allocated at least $75 billion to HAMP, of which at least $50 billion is TARP money.

## C. Duties of a Participating Servicer Under HAMP

35.     Because Bank of America accepted $25 billion in federal funds and additional loan guarantees, it was required to participate in HAMP for the loans on which it functions as a loan "servicer."  On April 17, 2009, Steve R. Bailey, of Bank of American, N.A., executed a Servicers Participation Agreement ("SPA") with the federal government.

36.     The SPA executed by Mr. Bailey incorporates all  "guidelines," "procedures," and "supplemental documentation, instructions, bulletins frequently asked questions, letters, directives, or other communication," referred to as "Supplemental Directives," issued by the Treasury, Fannie Mae or Freddie Mac in connection with the duties of Participating Servicers.  These documents together are known as the "Program Documentation (SPA I.A.)," and are incorporated by reference herein.  The SPA mandates that a Participating Servicer "shall perform" the activities described in the Program Documentation "for all mortgage loans it services."

37.     The first Supplemental Directive ("SD") was issued on April 6, 2009 and states that the national mortgage modification program was "aimed at helping 3 to 4 million at-risk homeowners – both those who are in default and those who are at imminent risk of default – by reducing monthly payments to sustainable levels."  This directive and the directives to follow were issued to provide guidance for adoption and implemental of HAMP "to provide a borrower with sustainable monthly payments."

38.     The Program Documentation requires Participating Servicers to evaluate all loans which are 60 or more days delinquent or appear to be in imminent default (as defined by the Program Documentation), to determine which loans meet the HAMP eligibility criteria.  In addition, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect income and hardship information to determine if the borrower is eligible for HAMP modification.

39.     A HAMP Modification consists of two stages.  First, a Participating Servicer is required to gather information and, if appropriate, offer the homeowner a Trial Period Plan ("TPP").  Second, upon successful completion of the TPP, the Servicer must offer the homeowner a permanent modification.

40.     A mortgage is eligible for the HAMP if criteria enumerated in the Program Documentation are met.  Aside from criteria that require that the loan be a first lien mortgage originated before 2009, that the property be occupied, and that it be the borrower's principal residence, the most salient conditions are that the loan is delinquent or default is reasonably foreseeable; that the borrower documents a financial hardship (as defined in the Program Documentation); and that the "borrower has a monthly mortgage payment ratio of greater than 31 percent" of the borrower's monthly income.

41.     The servicer must "provide a borrower with clear and understandable written information about the material terms, costs, and risks of

the modified mortgage loan in a timely manner to enable borrowers to make informed decisions."

42.     Once the participating servicer has determined a mortgage borrower's eligibility for the HAMP, the servicer must apply the modification steps enumerated in the Program Documentation, in the stated order of succession until the borrower's monthly mortgage payment ratio is reduced to 31 percent of the borrower's monthly income.  These steps include capitalizing accrued interest and escrow advances, reducing the interest rate, extending the term and re-amortizing the loan (if necessary), and providing a principal forbearance (if necessary).

43.     After applying the enumerated modification steps to calculate the modified payment amount, a servicer must offer the qualifying borrower a TPP. The TPP consists of a three-month period in which the homeowner makes mortgage payments based on the modification formula stated in the Program Documentation.  Bank of America uses a standard form agreement to offer TPPs to eligible homeowners.  This agreement describes the homeowner's duties and obligations under the plan and promises a permanent HAMP modification for those homeowners that execute the agreement and fulfill the documentation and payment requirements.

44.     If the homeowner executes the TPP Agreement, complies with all documentation requirements and makes all three TPP monthly payments, the second stage of the HAMP process is triggered, in which the homeowner must be

offered a permanent modification.  The payment amount and interest rate in the modified loan are fixed for five years and equal to the payment amount and interest rate in the TPP.  Thereafter, the rate may increase annually by up to one percent until it reaches an interest cap which is the lesser of:  (i) the fully indexed and fully amortizing contract rate; or (ii) the Freddie Mac Primary Mortgage market Survey rate for 30-year fixed rate mortgage loans on the date the modification is prepared.  Once capped, the rate is fixed for the remainder of the term.

45.    HAMP prohibits a participating servicer from taking several actions including the following:

- Proceeding with a foreclosure sale.  Any foreclosure sale must be suspended and no new foreclosure action may be initiated during the trial period, and until the borrower has been considered and found ineligible for other available foreclosure prevention options;

- Requiring a borrower to make an initial contribution payment pending the processing of the trial period plan before the plan starts;

- Soliciting borrowers to opt out of consideration for HAMP during the temporary review period;

- Reporting borrowers as delinquent to credit reporting bureaus without explanation.  For borrowers who are

current when they enter a trial period, the servicer should report the borrower current but on modified payment if the borrower makes timely payments during the trial period.  For borrowers who are delinquent when they enter the trail period, the servicer should report in such a manner that accurately reflects the borrower's current workout status;

- Assessing prepayment penalties for full or partial prepayment as part of the modification.

46.    The HAMP requires a participating servicer to send a Borrower Notice to every borrower that has been evaluated for HAMP but is not offered a Trial Period Plan, is not offered a permanent HAMP modification, or is at risk of losing eligibility for HAMP because they have failed to provide required financial documentation.

47.    The HAMP presumes that final modifications will be extended and finalized upon completion of a TPP or shortly thereafter.  HAMP Supplemental Documentation dated December 22, 2009 addresses situations in which the borrower has completed the TPP but has not yet received a permanent modification.

> In situations where an eligible borrower successfully completed the trial period and should have been converted to a permanent modification, but for reasons beyond their control were not timely evaluated for a permanent modification, the servicer must promptly make a determination as to whether the borrower is eligible for a permanent HAMP modification.  If the borrower is eligible, then the

16

servicer must offer the borrower a permanent HAMP modification as soon as possible, but in no event later than sixty days after discovering the error.

48.     By entering into the SPA, Bank of America covenanted that all services will be performed in compliance with all applicable Federal, state and local laws, specifically including state laws designed to prevent unfair, discriminatory or predatory lending practices.

49.     Under the SPA, Bank of America also covenanted that it would perform the services required under the Program Documentation and the Agreement in accordance with the practices, high professional standards of care, and degree of attention used in a well managed operation, and no less than which Bank of America exercises for itself under similar circumstances, and that Bank of America would use qualified individuals with suitable training, education, experience and skills to perform the Services.

50.     Bank of America has routinely failed to meet its obligations under the SPA and the Program Directives.  Mortgage borrowers who request to be evaluated for a modification under HAMP routinely face unexplained delays and go weeks or months with no communication form Bank of America after providing the requested information.  Borrowers who attempt to contact Bank of America by telephone face long periods of time on hold and are transferred between service representatives in a deliberate effort to cause the borrower to give up and terminate the call.  Bank of America regularly falsely informs that it did not receive requested information and demands that documents be re-sent.

51.     Bank of America has routinely failed to live up to its end of the TPP Agreement and offer permanent modifications to homeowners.  In January 2010, the U.S. Treasury reported that Bank of America had 1,066,025 HAMP-eligible loans in its portfolio.  Trial periods have been started on only 237,766 of these loans.  Of those, just 12,761 resulted in permanent modifications (only 5% of the started Trial modifications and just over 1% of the eligible pool) even though many more homeowners had made all payments and submitted all documentation required by the TPP Agreement.

52.     The balance of 2010 showed little improvement.  Through December 31, 2010, Treasury Department data revealed that Bank of America had started a total of approximately 352,869 TPPs.  Of those started, only 90,243 had resulted in permanent modifications (approximately 25.5% of those which started, and approximately 8.5% of the eligible pool).   Another 12,783 homeowners were still in TPP which had already exceeded three months.

53.     Bank of America is not complying with HAMP in a manner that can only be considered deliberate.  Bank of America's general practice and culture is to string homeowners along with no intention of providing actual and permanent modifications.  Instead, Bank of America has put processes in place that are designed to foster delay, mislead homeowners and avoid modifying mortgage loans.

54.     Bank of America commonly uses a delay tactic of encouraging or even requiring homeowners to resubmit financial information each time the

customer calls in to inquire about a pending modification.  Any change in financial information – even a small change – then causes Bank of America to restart the application process under the pretext of changed factual information.

55.   Bank of America customer service representatives mislead homeowners who call to inquire about loan modifications for which they have applied.  Bank of America customer service representatives regularly inform homeowners that modification documents were not received on time or not received at all when, in fact, all documents have been received.  Similarly, homeowners are regularly told that documents were sent on a particular date when, in fact, they had not been sent at all.

56.   Bank of America regularly ignores completed loan modifications by not properly reflecting the modification in its computer system.  Bank of America continues to treat the loan as delinquent by sending delinquency notices, reporting homeowners as delinquent to credit reporting agencies, and by instituting foreclosure proceedings.

57.   Bank of America regularly fails to properly credit payments homeowners make under a Trial Payment Plan.  Bank of America commonly applies payments to late fees or foreclosure fees and then deems a payment the homeowner made under a trial plan to be insufficient.  Bank of America's regular practice is to place payments a homeowner makes into a suspense account or "partial payment balance account" and not to credit the homeowner's

regular mortgage account. This results in Bank of America treating a homeowner who has made timely payments under a Trial Plan as delinquent.

58.     Bank of America does not employ the "waterfall" method mandated by HAMP. In addition, Bank of America has manipulated homeowners' financial records in its computer system to the homeowners' detriment.

59.     Despite the HAMP directives regarding the specific manner in which homeowners in the process of applying for a modification or in a Trial Period Plan are to be reported to credit reporting agencies, Bank of America's practice is to report homeowners to credit reporting agencies as being delinquent without any further explanation thereby further damaging the homeowners' credit.

60.     The vast majority of homeowners who seek a HAMP modification with Bank of America do not ever receive a permanently modified loan but are instead delayed indefinitely.

61.     By failing to live up to the TPP Agreement, failing to convert TPPs into permanent modifications and otherwise improperly handling consumers request to modify their home loan pursuant to HAMP, Bank of America is leaving homeowners in limbo, wondering if their home can be saved and preventing homeowners from pursuing other avenues of resolution, including using the money they are putting toward TPP payments to fund bankruptcy plans, relocation costs, short sales or other means of curing their default.

62.    Bank of America's actions are damaging, among other things, to the credit scores and other credit information of Plaintiff and the members of the Class, hurting Class members' ability to engage in other financial transactions because of negative marks on their credit reports.

### D.  Plaintiff's Effort to Obtain a Loan Modification Under Hamp

63.    Plaintiff Heather Galasso purchased her home on July 24, 2007. She financed her mortgage on July, 2007 with Countrywide Bank FSB (now owned by Bank of America). The terms of the loan provided for a thirty- year fixed rate mortgage with an interest rate of 6.75 %.  The mortgage loan required payments of $ 868.47 per month, which did not include taxes, insurance, or Private Mortgage Insurance payments.  These payments were scheduled to last for a full thirty (30) years.

64.    The servicing of Ms. Galasso's mortgage was transferred to, or otherwise assumed by Defendant BAC Home Loans. Ownership of the notes remained with Bank of America.

65.    Ms. Galasso made all regularly scheduled payments in full and on time and remained current on her mortgage. In fact, at no time prior to her mortgage modification request did Ms. Galasso ever fall behind on her mortgage payment.

66.    In November of 2009 Ms. Galasso became aware that mortgage companies were modifying home-owners' mortgages due to the tightening of the economy and the inability of some home-owners to meet their monthly

obligations. Realizing that her budget was strained and faced with a possibility that her interest rate could be reduced to alleviate the financial pressures, Ms. Galasso contacted BAC Home Loans about a possible modification. Despite her financial strain, and during each and every month leading up to her trial period, Ms. Galasso made all of her monthly mortgage payments in full and on time.

67.    In November 2009, Ms. Galasso requested by telephone to be considered for a HAMP modification, and submitted all information requested with the application. The representative for the Bank of America informed Ms. Galasso that in order for her to be eligible for the modification she would first have to be a participant in the temporary trial program, i.e. TPP.

68.    Bank of America did not advise Ms. Galasso that by making a modified (reduced) mortgage payment pursuant to the TPP, the Bank may or would report to her credit bureaus that she was paying less than agreed on her mortgage payment.

69.    On December 1, 2009, Ms. Galasso received a "Home Affordable Modification Trial Period Plan" from Bank of America along with a letter dated December 1, 2009. The letter stated "instead of making your existing mortgage payment, you will now make the new four-month trial period mortgage payment of $916.36." It then instructed Ms. Galasso to provide certain documents. See Exhibit A.

70.    Enclosed with the letter was a Home Affordable Trial Period Plan that set forth terms consistent with the letter. This document opens by stating:

> *If I am in compliance with this Trial Period Plain (the "Plan") and my representations in Section 1 continue to be true in all material respects, then the servicer will provide me with a Home Affordable Modification Agreement ("Modification Agreement"), as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Notes secured by the Mortgage [ Id.]*

71.    On January 15, 2010, Ms. Galasso signed and returned a copy of the Trial Period Plan to Bank of America using the self-addressed Federal Express envelope that Bank of America provided. Along with the signed agreement, she sent Bank of America copies of the documents it requested including a signed "Hardship Affidavit," IRS form 4506-T, bank statements, pay stubs, her most recent tax return, and the Freddie Mac Form 1126.

72.    Included in the December 1, 2009 letter was a Section 6a-Commonly Used Program Terms. Under paragraph 8 of the terms, Bank of America states that "*if you are delinquent when you enter the trial period, we will continue to report your loan as delinquent to the credit-reporting agencies during the trial period even if you make your initial period payments on time. However, after your loan is modified, we will only report the loan as delinquent if the modified payment is not received in a timely manner.*" As previously mentioned, Ms. Galasso was not behind on her mortgage payments when she entered into the trial modification period. Bank of America failed to advise Ms. Galasso that it would report her reduced payments to the credit reporting bureaus, and that the TPP would in fact adversely impact her credit score.

73.     On January 15, 2010 Ms. Galasso made her first payment. Bank of America accepted this payment and it was debited from her bank account on January 19, 2010.

74.     Ms. Galasso made each of the payments itemized in the Trial Period Plan in full prior to the date each payment was due. The representations she made in Section 1 of the Trial Period Plan remained true in all material respects.

75.     After fully complying with the terms of the Trial Period Plan during the three month period, and having heard nothing more, Ms. Galasso began calling Bank of America on a regular basis to inquire as to the status of her permanent modification. Ms. Galasso was regularly transferred to multiple departments with each call and spent long periods of time on hold.  She was, at all times, advised that her permanent modification was "under review."

76.     On several occasions, Bank or America representatives instructed Ms. Galasso to resubmit documents she had previously provided and claimed to be missing documents. Each time they were requested, Ms. Galasso dutifully and timely provided Bank of America all documents requested.

77.     Ms. Galasso continued to tender payments of $916.36 each month prior to the first day of the month.  Payments were made by telephonic transaction, since Bank of America had locked Ms. Galasso out of her web-based account access page – thereby further preventing her from determining the true status of her account.   Bank of America accepted each payment.

78.     On March 25, 2010 a full four months after Ms. Galasso had already been enrolled in a TPP, and after previously submitting all of the requested information, Bank of America sent another letter indicating that it could provide a more affordable mortgage payment. Yet again, Ms. Galasso sent all of the requested information to Bank of America and faxed the pertinent documents to Bank of America on April 8, 2010 at 2:30 p.m.  See Exhibit B.

79.     Each month with her monthly mortgage bill, Ms. Galasso received a notice attached to her mortgage bill indicating that she was currently participating in a Home Affordable Modification Trial Period Plan.  The Notice further stated that during the TPP, she could "make [her] monthly payments at the Trial Period monthly payment amount, which is $ 916.36, instead of the amount shown on [the] statement."

80.     On October 20, 2010, some ten months after beginning the TPP, and after having made ten (10) TPP payments in full and on time, Ms. Galasso received a letter from Bank of America stating "there are no available workout options based on the financial information that was provided."  Exhibit C.

81.     Approximately five days later, Ms. Galasso received a notice about her mortgage, enclosing what was described as "important information regarding fees." The letter thanked her for participating in the loan modification process, and then provided her with information about fees charged on loans that are in default status under the terms of her loan documents. See Exhibit D.

82.     On February 8, 2011 Ms. Galasso received a "Notice of Intent to Accelerate" letter from Bank of America which showed her mortgage as being in arrears in the amount of $ 3,359.70.  In an attempt to save her home from an express threat of foreclosure, and at great personal and financial sacrifice, Ms. Galasso promptly borrowed from a third-party, and paid to Bank of America, the sum of $ 3,359.70. See Exhibit E.

83.     Ironically, the Notice of Intent to Accelerate included among its enclosures an informational flyer suggesting that Ms. Galasso consider the HAMP – the very program which, as detailed above, resulted in the alleged "arrears" upon which Bank of America relied when considering acceleration.

84.     Bank of America reported to credit reporting bureaus that Ms. Galasso was delinquent on her mortgage on or about March 2010. Prior to entering the Trial Period Plan with Bank of America, Ms. Galasso had excellent credit. Despite being in the middle of the modification process, Bank of America still reported to her credit bureaus that she was paying less than agreed.

85.     At no time, prior to the Trial Period and through the modification process did Bank of America advise Ms. Galasso that by entering the Trial Period her credit would be impacted and that her credit score would drop dramatically. Despite being in the HAMP process, Bank of America reported a 31-60 day delinquency on her home loan. Currently, the reports by Bank of America are the only delinquencies continuing in nature that are present on her credit report.

## <u>PLAINTIFF'S CLASS ACTION ALLEGATIONS</u>

86.     Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

87.     Plaintiff brings this action under Rule 23 of the Federal Results of Civil Procedure, on behalf of themselves and a Class consisting of:

> All individuals Kentucky homeowners (or former homeowners) whose loans have been serviced by one or both Defendants; and
>
> who have requested or been otherwise eligible for a modification under the terms of HAMP Program Documentation; and
>
> whose loan Bank of American has not permanently modified either because:
>
> a) Bank of America has not offered them a TTP; or
>
> b) Bank of American denied them a permanent loan modification after they complied with all required obligations under HAMP, as conveyed to them by Bank of America.

88.     Excluded from the Class are governmental entities, Defendants, their affiliates and subsidiaries, Defendants' current or former employees, officers, directors agents, representatives, their family members, and members of this Court and its staff.

89.     Plaintiff does not know the exact size or identities of the members of the proposed class, since such information is in the exclusive control of Defendants.   Plaintiff believes that the Class encompasses many hundreds and perhaps thousands of individuals whose identities can be readily ascertained

from Defendants' books and records.  Therefore, the proposed Class is so numerous that joinder of all members is impracticable.

90.     Based on the size of the modifications at issue, Plaintiffs believe the amount in controversy exceeds $5 million.

91.     All members of the Class have been subject to and affected by the same conduct.  The claims are based on the terms of a single unifying contract between Bank of America and Fannie Mae, acting as agent for the United States Treasury, and on form contracts and uniform loan modification processing requirements.  There are questions of law and fact that are common to the class, and predominate over any questions affecting only individual member of the Class.  These questions include, but are not limited to the following:

  a.  The nature, scope and operation of Bank of American's obligations to homeowners under HAMP;

  b.  Whether Bank of America breached its duties under HAMP that were intended for the benefit of Plaintiff and members of the Class;

  c.  Whether the manner in which Bank of America has executed the duties it undertook as part of the HAMP program violates its duty of good faith and fair dealing;

  d.  Whether Bank of America's receipt of an executed loan modification agreement, along with supporting documentation and three monthly payments, creates a binding contract or

otherwise legally obligates Bank of America to offer Plaintiff and members of the Class a permanent HAMP modification;

e.  Whether Bank of America's failure to provide permanent HAMP modification in these circumstances amounts to a breach of contact and/or a breach of the covenant of good faith and fair dealing;

f.  Whether Bank of America demanded and collected initial payments from eligible homeowners in violation of HAMP provisions;

g.  Whether Bank of America's credit reporting practices violated one or more provisions of HAMP;

h.  Whether Bank of American's written representations to homeowners stating that they would receive permanent loan modifications upon successful completion of the trial period and then failing to provide such permanent modification constitutes an unfair or deceptive practice under the Kentucky Consumer Protection Act, Kentucky Revised Statues, Chapter 367.170;

i.  Whether the above practices caused Plaintiff and members of the Class to suffer injury; and,

j.  The proper measure of damages and the appropriate injunctive relief.

92.     The claims of the individual named Plaintiff are typical of the claims of the Class and do not conflict with the interests of any other members of the Class in that Plaintiff and the other members of the Class were subject to the same conduct, were subject to the terms of the same agreement and were met with the same absence of a permanent modification.

93.     The individual named Plaintiff will fairly and adequately represent the interests of the Class.  She is committed to the vigorous prosecution of the Class's claims and has retained attorneys who are qualified to pursue this litigation and have experience in class actions – in particular, consumer protection actions.

94.     A class action is superior to other methods for the fair and efficient adjudication of this controversy.  A class action regarding the issues in this case does not create any problems of manageability.

95.     This putative class action meets the requirements of Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3).

Bank of America has acted or refused to act on grounds that apply generally to the Class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## COUNT I

## BREACH OF CONTRACT/BREACH OF DUTY
## OF GOOD FAITH AND FAIR DEALING

96.     Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

97.    Plaintiff brings this claim on her own behalf and on behalf of each member of the Class described above.

98.    The Servicer Participation Agreement ("SPA") with the United States Government and the explicitly incorporated Program Documentation constitute a contract for which Plaintiff and the Class are intended beneficiaries, and under which Bank of America has undertaken duties to act for the benefit of Plaintiff and the Class.

99.    By entering into the SPA and accepting valuable consideration including $ 25 billion in funds from the U.S. Treasury, Bank of America covenanted, on behalf of itself and its subsidiaries, to discharge and administer its contractual obligations with principles of good faith and fair dealing.

100.    Bank of America has breached its contractual duties by failing to provide eligible borrowers with the opportunity to accept permanent loan modifications.

101.    In addition to duties to Plaintiff based on her status as third-party beneficiary of the SPA, Bank of America entered into individual contracts directly with Plaintiff.

102.    The Agreement sent by Bank of America to Plaintiff constitutes a valid offer.

103.    By executing the Agreement and returning it to Bank of America, along with the supporting documentation, Plaintiff accepted Bank of America's offer.

31

104.    Alternatively, Plaintiff's return of the Agreement constitutes an offer. Acceptance of this offer occurred when Bank of America accepted Plaintiff's TPP payments.

105.    Plaintiff's TPP payments to Bank of America constituted consideration.

106.    Plaintiff and Bank of America thereby formed a valid contract.

107.    To the extent that the contracts were subject to a condition subsequent providing Bank of America an opportunity to review the documentation submitted by Plaintiff when she returned the signed TPP, this condition was waived by Bank of America and/or it is stopped to assert it as a defense to Plaintiff's claims.

108.    By failing to offer Plaintiff permanent HAMP modification, Bank of America breached those contracts.

109.    Bank of America routinely and regularly breaches its duties under both the SPA and their contract with individual Plaintiffs by failing to retain, employ, and supervise adequately trained staff; by instituting and/or continuing with foreclosure proceedings against borrowers in a trial program; by failing to provide written notices required by HAMP; by deliberately acting to delay and otherwise frustrate loan modification processes; routinely demanding information already in its files; by making inaccurate calculations and determinations of Plaintiffs' eligibility for HAMP; and by failing to follow through on written and implied promises.

110.    Plaintiff remains ready, willing, and able to perform under the contract(s) by making the payments which should have been calculated as part of a permanent modification, as well as by providing any documentation deemed necessary under the terms of HAMP.

111.    Plaintiff has suffered harm and is threatened with additional harm from Bank of America's breach. By making TPP payments both during and after the initial three month period of the TPP, Plaintiff forwent other remedies that she might have pursued in order to reduce the likelihood of default and, correspondingly, to protect her home from further threat of foreclosure. Plaintiff also suffered harm by being forced to pay the alleged arrears in order to save her home. On information and belief, some putative Class members have suffered additional harm in the form of foreclosure activity against their homes.

## COUNT II

### PROMISSORY ESTOPPEL, IN THE ALTERNATIVE

112.    Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

113.    Plaintiff brings this claim on her own behalf and on behalf on each member of the Class described above.

114.    Bank of America, by way of its TPP Agreements, made a representation to Plaintiff that if she returned the TPP Agreement executed and

with supporting documentation, and made her TPP payments, she would receive a permanent HAMP modification.

115.   Bank of America's TPP Agreement was intended to induce Plaintiff to rely on it and make monthly TPP payments.

116.   Plaintiff did indeed rely on Bank of America's representation, by submitting the trial period payments.

117.   Given the language in the TPP Agreement, Plaintiff's reliance was reasonable.

118.   Plaintiff's reliance was to her economic detriment.

## COUNT III

## ACTION FOR RECOVERY OF MONEY UNDER K.R.S. 367.220, K.R.S. 367.170 KENTUCKY CONSUMER PROTECTION ACT

119.   Plaintiff hereby incorporates by reference each and every allegation contained in the paragraphs as if fully rewritten herein.

120.   Plaintiff brings this claim on her own behalf and on behalf of each member of the Class described above.

121.   The conduct of Bank of America as set forth herein constitutes unfair or deceptive acts or practices, including its practice of leading borrowers to believe that it will permanently modify their mortgage loans upon successful completion of a TPP; and the illegal collection of upfront fees.

122.   Bank of America's conduct as set forth herein occurred in the course or trade or commerce.

123.    Under Kentucky's Consumer Protection Act, unfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce are unlawful.

124.    As a direct and proximate result of Bank of America's unfair, false, misleading and deceptive conduct, Plaintiff and Plaintiff's Class Members have suffered damages in an amount to be proved at trial.

125.    Bank of America acted intentionally with actual malice or with reckless disregard for the rights of Plaintiff and Plaintiff's Class Members, thereby entitling Plaintiff and Plaintiff's Class Members to recover punitive damages, compensatory damages, attorneys' fees, costs, pre- and post-judgment interest.

## COUNT IV

## NEGLIGENT MISREPRESENTATION and NEGLIGENT SERVICING

126.    The preceding paragraphs in this Complaint are incorporated by reference as if fully set forth herein.

127.    Plaintiff brings this claim on her own behalf and on behalf of each member of the Class described above.

128.    Defendants owed the Plaintiffs a duty of reasonable professional care in administering the HAMP program.

129.    The Defendants accepted mortgage modification applications and made representations to the Plaintiff that were false in nature.  By failing to administer the program in a timely manner, Bank of America needlessly and recklessly inflated the Plaintiff's late fees and damaged her credit.

130.   The Plaintiff relied upon the material misrepresentations of the Bank of America and their agents and subsequently applied for a mortgage modification in a Bank of America administered program that was flawed from the inception.

131.   Bank of America, either directly or through its agents, provided false information that misguided the Plaintiff, resulting in pecuniary loss, further financial debt and damages to the Plaintiff.

132.   Bank of America owed the Plaintiff a duty of reasonable care and competence in obtaining the proper rate information and then communicating that information to the Plaintiff.  Bank of America failed in this duty, even when there was a federal mandate to keep homeowners in their residences.

133.   Bank of America's conduct was negligent and the proximate cause of identifiable damages sustained by Plaintiff and Class members.

134.   Plaintiff and Class members are entitled to compensation, pre- and post-judgment interest, attorneys' fees and costs.

## COUNT V.

## UNJUST ENRICHMENT

135.   Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

136.   Plaintiff brings this claim on her own behalf and on behalf of each member of the Class described herein.

137.    Plaintiff and the Class conferred a benefit upon Defendants by paying for loan modification services, which provided Defendants with a stream of revenue from the provision of their services.

138.    By concealing from customers that Defendants were not adhering to the contractual obligations they undertook in accepting billions of dollars from the United States government to implement and administer the HAMP program, the Defendants failed to provide the loan modification serviced they purported to provide, thereby making the retention of the financial benefit conferred by Plaintiff and the Class unjust.

139.    Defendants, through their employees, agents, and representatives, have engaged in acts, methods or practices of deception, fraud, false pretense, false promise, misrepresentation, unfair practice or concealment, suppression or omission of facts in connection with providing loan modification services including, among other things:

a)  Concealing from customers that Defendants were not adhering to the contractual obligations they undertook in accepting billions of dollars from the United States government to implements and administer the HAMP program;

b)  Routinely failing to meet their obligations under their agreements to provide loan modification services;

c)  Routinely forcing mortgage borrowers who request to be evaluated for a modification to face unexplained delays and go weeks or

months with no communication from Bank of America after providing the requested information;

d) Routinely forcing borrowers who attempt to contact Bank of America by telephone to face long periods of time on hold and be transferred between service representatives in a deliberate effort to cause the borrower to give up and to terminate the call;

e) Regularly falsely informing borrowers that Bank of America did not receive requested information and demanding that documents be re-sent; and

f) Routinely and serially stringing out, delaying, and otherwise hindering the loan modification processes that Bank of America contractually undertook to facilitate when it accepted billions of dollars from the United States.

140.   Nevertheless, Defendants appreciated and retained the benefit conferred by Plaintiff and the Class, which is unjust, unfair, and inequitable, in the circumstances described herein.

**WHEREFORE**, Plaintiff, on her own behalf and on behalf of the other members of the Class, request Judgment and relief on all causes of action as follows:

1.   An order from this Court certifying this action as a class action under Kentucky Rules of Civil Procedure, and appointing Plaintiff as representative of the Plaintiffs' Class described herein;

2.    Judgment in favor of Plaintiff and Class members against Bank of America, jointly and severally, in an amount to be ascertained at trial and that includes monies paid to Defendant(s) by Plaintiff and Class members for excessive fees paid as a result of the wrongful acts set forth above;

3.    Judgment in favor of Plaintiff and Class members and against Defendants, jointly and severally, awarding Plaintiff and Class members pre-judgment and post judgment interest to compensate them for Defendants' wrongful use of Plaintiff's and Class members' money;

4.    Judgment in favor of Plaintiff and Class members and against Defendants, jointly and severally, awarding Plaintiff's and Class members' attorneys fees, Class Representative incentive fees, litigation expenses, including fees and costs of expert witnesses, and all other costs of this action;

5.    Grant a permanent or final injuction enjoining Bank of America's agents and employees, affiliates and subsidiaries, from continuing to harm Plaintiff and the members of the Class;

6.    Order Bank of America to adopt and enforce a policy that requires appropriate training of their employees and agents regarding their duties under HAMP;

7.    Order specific performance of Bank of America's contractual obligations together with other relief required by contract and law;

8.    That the undersigned counsel be appointed as Class Counsel;

39

9.      Judgment in favor of Plaintiffs and Class members and against Defendants, jointly and severally, awarding Plaintiffs and Class members such other and additional legal or equitable relief as may be just and warranted under the circumstances.

### *JURY DEMAND*

Plaintiffs demand a trial by jury on all issues that may be so tried.


Respectfully submitted:

**EDMONDSON & ASSOCIATES**

/s/   *Alexander F. Edmondson*
Alexander F. Edmondson ( 88406)
28 West 5th Street

Covington, KY 41011
P (859) 491-5551 F (859) 491-0187
aedmondson@edmondsonlaw.org


/s/   *Jason V. Reed*
Jason Reed ( 87513 )
28 West 5th Street
Covington, KY 41011
P (859) 491-5551 F (859) 491-0187
jayvincent@yahoo.com